IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

E-P INTERNATIONAL DISTRIBUTION,   )
Inc., a Barbados corporation,                  )
                                                                )            8:07CV186
                          Plaintiff,                      )
                                                                )
            v.                                                )
                                                                )            MEMORANDUM AND ORDER
SAV-RX, LLC, a Nebraska corporation,   )
and A&A DRUG COMPANY, INC.,          )
                                                                )
                          Defendants.                 )
_____   )

        This matter is before the court after a trial on the merits.  This action for breach of

contract and fraudulent misrepresentation was tried to a jury on December 13-17, 2010.

The court reserved ruling on parties' Rule 50 motions pending receipt of the jury's answers

to special interrogatories, and withheld entry of judgment pending ruling on the motions.

The parties' equitable claims and defenses have also been submitted to the court for

resolution.

        I.  Findings of Fact

        The dispute between the parties involves a joint business venture.  Defendant A&A

Drug Company ("A&A") is a national pharmaceutical provider that does mail-order business

under the name Sav-Rx Prescription Services.  Defendant and intervenor James Barta is

the sole shareholder of A&A.  The plaintiff, E-P International Distribution, Inc. ("EPI"),

formerly known as E-Pharma International, is the entity formed to operate the venture.  EPI

is a Barbados corporation with three shareholders:  James Barta, the MMB Family Trust

(hereinafter sometimes referred to as the "Silberg family trust"), and the B3M Family Trust

(hereinafter, sometimes referred to as the "Rigby family trust").  The MMB Family Trust is

composed of Hilton Silberg and his family.  The B3M Family Trust is composed of Malcolm Rigby and Barbara Rigby, and their sons, Michael Rigby and Marc Rigby.  Mr. and Mrs. Rigby, Mr. Silberg and Mr. Barta were all directors of EPI and Barbara Rigby was the chairperson of the board of directors.

From approximately February 11, 2002, through June 26, 2006, A&A and EPI were involved in a business relationship whereby EPI agreed to supply A&A's customers with less-expensive prescription medications purchased outside the United States.  The parties stipulated that they entered into an oral agreement to conduct the business venture and stipulated to several of the agreement's terms:  Physicians and customers of A&A placed orders for pharmaceutical prescriptions directly with A&A/SAV-RX.  A&A/SAV-RX was paid by its customers for the pharmaceutical prescription orders.   A&A forwarded the pharmaceutical orders to EPI.  EPI arranged for third-party suppliers located outside the United States to fill the pharmaceutical prescription orders and ship the orders directly to the A&A customers.  EPI issued invoices to A&A.  EPI's profits were to be divided equally between the three shareholders.

Other terms of the agreement were disputed at trial.  At trial, EPI contended that A&A is liable for drugs EPI purchased and shipped to A&A's customers in the amount of approximately $4.5 million.  James Barta acknowledged that he had withheld payment to EPI, but argued that many prescriptions were either not delivered or were double-billed and he also asserted that EPI owed A&A substantial sums of money for commissions and owed Barta substantial dividends and contended he was entitled to an offset of those amounts.

Hilton Silberg, and James Barta all testified to the terms of the oral agreement. The agreement was finalized at meetings in Barbados and Chicago. Hilton Silberg is a pharmacist licensed in Canada. With respect to the terms of the oral agreement, Hilton Silberg testified that the parties agreed that 10% of gross sales was to go to A&A and that Silberg was to be paid 10% of the net cost of the drugs he sourced. Mr. Silberg acknowledged that A&A was never paid the 10%, but testified that the parties contemplated that it would be calculated along with Barta's share of the profits. Silberg also testified that A&A had agreed to bear the cost of all refunds, reshipments or duplicates of the medications up to 5% of total gross sales.

He testified that he used his line of credit to obtain the drugs. A&A consistently paid EPI with wire transfers, generally on a monthly basis from February 2002 to July 2005. Ex. 388. He testified that at first he procured medications from Canada, but later found the medications could be procured in South Africa for less. He arranged for Jeff Greenfield, a former pharmacy school classmate who was licensed in South Africa, to procure the drugs. The evidence establishes that the venture ran smoothly and was profitable for the first few years. See Exs. 389, 390, 391, 392, 393, EPI Profit & Loss Statements. The venture began to fall apart in July of 2005, when Greenfield absconded to Australia with approximately $150,000 of the company's money, a laptop containing the company's records, and medications. Silberg stated that Greenfield had "lost his way." Greenfield was never prosecuted or sued because of the episode.

Silberg testified that he then began to procure medications in Barbados and elsewhere through Tonley, a company he owned, and later through Barhill, an entity he created that was owned by the Rigby family and Silberg family trusts. The record shows Silberg received at least $600,000 in commissions for Tonley. *See* Ex. 118, Ex. 203.

Barbara Rigby testified that she is a nurse and has an Executive MBA.  She stated that EPI was managed by directors and consultants.  She and her husband, Malcolm Rigby, were the persons most involved in the day-to-day operations of the business.  She testified she was responsible for billing and maintaining the company's billing records on QuickenBooks and she wrote all the checks.  She owns a professional consulting firm known as "1314167 Ontario, Ltd."  She testified that the parties agreed at the outset to pay her consulting company fees of $12,000 per month initially, and later $15,000 per month, for her services and those of her husband.  She wrote checks from EPI to 1314167 Ontario for the monthly consulting fees.  She also testified her consulting company was paid $100,000 in additional fees in August 2002.  She acknowledged that she received over $900,000 in consulting fees over the course of the venture.  Ex. 371.

Mrs. Rigby testified that she created the invoices sent to EPI by manually entering the quantity of drugs ordered and the date the drugs were ordered within approximately one week of the date that her husband ordered the supplied medication, using QuickenBooks.  QuickenBooks is accounting software that can be purchased at Best Buy or Costco.  Mrs. Rigby testified that, although she has an executive MBA, she has no formal training in bookkeeping.  She acknowledged that it might have been prudent for an organization with multi-million-dollar revenues to have a third-party accounting or bookkeeping service maintain its books.  She stated that no effort was made to enter the patient's prescription number or name into the QuickenBooks data.  EPI never kept any record of medications that were duplicates, credits or reshipments.  She testified that there were no yearly reconciliations regarding any medications that were not received by customers.

4

Mrs. Rigby also testified that she prepared the company's profit and loss statements using QuickenBooks. Those profit and loss statements indicate that in 2003, EPI had $3,313,208 in sales and realized a gross profit of $1,907,872; in 2004, sales of $7,245,343 and a gross profit of $3,807,298; in 2005, sales of $8,222,788 and gross profits of $3,887,823; in 2005, sales of $4,743,183 and gross profits of $1,316,212; and in 2006, sales of $330,536 and a loss of $120,118. *See* Exs. 389-393. The profit and loss statements also show that over the course of the venture $1,599,962 was paid to consultants and $735,272 was paid in dispensing fees.

During the course of the venture, dividend distributions were made in the following amounts: $693,611 to the Rigby family trust; $1,188,313 to the Silberg family trust; and $601,200 to James Barta. Mrs. Rigby also testified that money was transferred into the Silberg family trust as payment for Mr. Silberg's 10% commission on the net products that he sold EPI. Further, she stated that EPI loaned $300,000 to Mr. Silberg as an advance on dividends and acknowledged that it has never been repaid and remains owing to EPI. EPI no longer engages in any business activity.

She further testified that the parties agreed that the amounts of money for Barta's benefit were to be held in a segregated account. She had access to that account and testified that funds were paid into the other shareholder's account and not to Mr. Barta's because the receivables were so high.[1] Mrs. Rigby testified that taxes were paid in

---

[1]The court notes that the record shows in documents submitted in motion practice earlier in this litigation that Barbara Rigby testified in deposition that she was instructed to keep track of what she described as Barta's "commission," but that Barta did not want those amounts kept on the books so she kept a running tab off the books, knowing that the funds were payable to Barta. *See* Filing No. 132, Index of Evid., Ex. C, Deposition of Barbara Rigby at 99 (Doc #123-5, Page ID # 691). She stated that Barta's money was not kept in a segregated bank account; the funds were kept in a segregated account within the company structure "so they wouldn't be considered dividends and [Barta] wouldn't have to pay taxes on them in the States[.]" *Id.* at 99. One-third of the profits were segregated in this manner for the first two years; however, when Barta

Barbados, where taxes are not assessed on revenue, but on money spent there. She stated she was unable to obtain copies of the tax returns for this litigation because the company that prepared them had gone out of business.

She also testified that she no longer has any records or invoices for the period from July 2005 to November 2005. She acknowledges that she has no physical invoices for over $1.3 million in sales. Those were lost in the theft of the laptop computer by Greenfield. The evidence shows EPI also lost computer records when lightening struck the Rigbys' home and their computer crashed. She testified there were no backups of the data, but acknowledged that she was aware that there are professional entities that provide data protection for businesses.

Mrs. Rigby testified that the venture or engagement ended in June of 2006. Shortly thereafter, she traveled to Fremont, Nebraska, to try to wind things up and close out the venture. Based on EPI's records, she and Alan Sheppard, A&A's controller, prepared several spreadsheets. One shows EPI's sales and profits after deducting for reshipments, refunds, duplicate and credits, and calculates net profits with A&A's 10% "commission" or "administrative fee" deducted from EPI's gross sales figure and the Rigbys' consulting fees, as well as payments to Silberg or companies he owned, added back in to the company's expenses. *See* Ex. 118. That calculation results in an amount due and owing from A&A and/or James Barta in the amount of $443,417.62. *Id.* Mrs. Rigby disputed the figures on that spreadsheet.

---

stopped paying his invoices, Barbara Rigby withdrew money from the segregated funds and testified that she told Barta she was doing so. *Id.*

Mrs. Rigby testified that in November 2006, she received an e-mail from Lisa Quincy, James Barta's assistant, stating that Mr. Sheppard had gone over the numbers and was confident of their accuracy and that Mr. Barta was willing to pay the $443,417.62 and close the issue. Ex. 104. Ms. Quincy's e-mail indicates that the calculation was based on $517,848.42 for drugs not received/refunds made; $34,451.35 for credits given; $117,933.03 for overbilling for reshipments from 2003 to July 2005; and $342,312.40 for overbilling for reshipments after August 2005. *Id.* Mrs. Rigby testified that Mr. Barta ultimately sent her a check in the amount of $443,417.62 and Mrs. Rigby sent it back to him.

Mrs. Rigby stated that her position was that approximately $4.6 million was outstanding from A&A as an account receivable, and that approximately $2.2 million was owed to A&A as 10% of gross profits, leaving $2.4 million to be divided among the three shareholders for their respective portions of the profit. Also, she contended that EPI was not responsible for any reshipments because A&A had agreed to absorb those losses.

Malcolm Rigby testified that he is a software developer and was present at a meeting in Chicago in Fall of 2001 with Barta and Silberg to formalize the oral agreement to create EPI. He testified that they agreed that A&A was to receive 10% of gross sales and Silber was to receive 10% (net) of the drugs he sourced. He further testified that the parties agreed that he and Barbara Rigby would receive $12,000 a month for consulting and that A&A/Barta would absorb any risk of loss for lost shipments, misdeliveries, etc., up to 5%. He stated that he continued to receive the monthly consulting fee payment throughout the length of entire engagement until June 2006. Mr. Rigby testified that he

and his wife were the only consultants employed by the consulting company "1314167 Ontario Ltd."

Mr. Rigby further testified that James Barta stated that he normally billed for prescriptions at 85% of the average wholesale price (which an industry standard used in the United States for setting prices in the pharmacy benefit management business, based on what a buyer of bulk drugs would pay a drug company for those drugs).[2]  Rigby and Silberg told Mr. Barta that the medications could be purchased outside the United States for less.  Barta asked if they could get the medications for 25% less than what he had been charging and still make money at that price.  He stated that he wanted to get a good deal for his customers.  Barta, Silberg and Rigby agreed to a price formula for the international mail-order customers of fifteen percent off the AWP, plus $2.00 per prescription, less twenty-five percent of that amount.

Mr. Rigby's role in the venture was initially to look at A&A's computer systems to figure out how to get the information needed to run the new company, without impacting the systems A&A had.  He designed a system and worked with a programmer to modify and to write programs that could take A&'s outputs and produce the information the new company needed to process orders.  On a nightly basis, he would log in from his computer and extract a prescription list, showing who the person was, what they paid for the drug and what the drug was.  He would remotely print SavRx labels, check inventory in several

---

[2]The average wholesale price is the subject of a series of class actions lawsuits and settlements based on pharmaceutical companies' alleged fraudulent inflation of the the "average wholesale price" ("AWP") to boost sales.  *See e.g.*, *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 27-28 (1st Cir. 2009).

countries (South Africa, Canada, Denmark and Latin America), and would have a pharmacist fill the prescriptions wherever he could get it at the lowest cost.

The evidence shows that as time went on, the FDA increasingly held up shipments of medications in customs and mailed letters to customers telling them that the drugs were available in the United States. The evidence shows some of these seized medications were eventually delivered to customers and some were sent back to the shipper. There is also evidence that A&A ordered reshipments of some of those medications and sometimes attempted to cancel orders that had already been shipped. Mr. Rigby testified that Greenfield took drugs that were supposed to be sent to customers of A&A but were never shipped.

There is evidence that Mr. Rigby was aware that EPI was double billing A&A for drugs, but left it to A&A to catch the error. In response to an inquiry from Jeff Greenfield in September 2003, Malcolm Rigby wrote:

> I don't think they reconcile what they ordered to what they ship unless by accident they bill their customer twice. This usually happens about a month later when the customer gets their credit card statement, SavRx then sends me all kinds of queries trying to figure it out. Yesterday I had a query to see if we double billed for a duplicate order which you caught back in July. The only other time is when Alan their CFO randomly checks one of our invoices and notices one of these Rx125886 (Rx125649) and Rx125887 (RxI15648) situations and wants to know why we are billing him twice. Which as you point out we are not aware of unless you catch it. That's why I say I don't know how much they double ship in the US - bet it is a lot. I've tried to sort out with them but unfortunately there is no internal communication within SavRx so I just bill them and ignore the double billing unless they point it out.

Ex. 124. Later, in an e-mail exchange between Malcolm Rigby and Jeff Greenfield dated January 17, 2005, Rigby suggested, "[l]ooked at back-order list. Why don't you just not bother filling. We will attribute to FDA." Ex. 123. Also, he acknowledged that many times EPI shipped two prescriptions to the same person without knowing it. He stated that he

had no idea whether A&A/SavRx had been paid twice.   He also testified that when customers didn't get their medication and contacted SavRx and SavRx asked EPI to reship it, Sav-Rx would be billed twice for the same prescription that the customer would only receive once.

James Barta testified that he is a pharmacist and owns A&A Pharmacy in Fremont Nebraska.   He also runs a mail-order prescription benefit service that contracts with employers and unions to manage prescription benefits that operates under the name SavRx.   He testified that his mail-order prescription business mails out approximately 10,000 prescriptions a day.   Mr. Barta explained that adjudication software is a computer system that interacts with insurers to determine payments, etc.   The system is set up to establish parameters with respect to eligibility and coverage and is used to bill third-party providers.

Regarding the terms of his agreement with the Rigbys and Silberg, he testified that he believed that a term of the agreement was that he would only be billed for medication that his customers received.   He testified that generally fewer than 1% of customers do not receive the medications and in his experience the rate of nondelivery was less than half of 1%.   He further stated that the parties had agreed he was to receive 10% of total gross sales.   He admitted that he withheld payment for EPI's invoices in 2005 and 2006 and testified that he withheld the payments in order to ensure that he would receive the 10%, as well as his one-third share of the company's profits.   He stated that 10% of all gross sales was an administrative fee for doing "all the work."   Further, he testified that he did not approve consulting fees for Mr. and Mrs. Rigby of $12,000 to $15,000 per month, nor did he approve withdrawal of over $100,000 in other consulting fees.   He also stated that he

never agreed that Silberg should receive a 10% markup on the orders he sourced.  He stated that he attended annual meetings in Barbados.

Mr. Barta also testified that his attorneys in Omaha drafted the shareholder's agreement.  His understanding was that A&A would only be invoiced for prescriptions filled, shipped and delivered to customers and that he, as a shareholder, would receive one-third of the total profit on the sale of the prescriptions.  He testified there were no discussions about A&A bearing the risk of loss of medications that did not reach the customer.

During the course of the engagement, he was aware that his controller, Alan Sheppard, was having trouble reconciling EPI's invoices to A&A's records because the invoices did not contain the customer's identity or any prescription number.  He also testified that he discussed with the other shareholders that the funds for his benefit were to be segregated and placed in a separate account at the bank in Barbados.

Alan Sheppard, who had been the controller at A&A during most of the term of the agreement but moved away, testified that Mr. Barta asked him to return as a consultant to wind up and close out A&A's relationship with EPI.  After the venture was dissolved, he met with Barbara Rigby and attempted to determine the amount that A&A and Barta owed EPI.  He determined, that the total gross sales (from which A&A was to be entitled to 10 percent) were $22,476,144.53.  Ex. 118.  That figure was based on EPI's sales and profit figures, less credits and refunds shown in A&A's accounting records.  His review resulted in the determination that A&A owed EPI $443,417.

Christy Piti testified that she is James Barta's daughter and is a pharmacist who is now employed as the Executive Vice-President of A&A.  She testified that in her experience, incidents in which prescriptions do not reach customers are rare.  She testified

11

that in late 2004 and 2005, problems with customers not receiving medications increased. After this litigation began, she examined A&A's adjudication system and performed an analysis to determine whether SavRx had been double-billed for prescriptions. She stated there were backup files of all A&A's prescription records. She testified she reviewed all the claims for the period of time at issue. She sorted the backup files by patient and created individual patient profiles for everyone who was provided medications procured by EPI. She testified she analyzed over 100,000 prescription claims and was able to identify obvious duplicates. She characterized the duplicate claims as "overbilling." She testified that if a prescription was a duplicate, A&A would have received a payment only once.

As part of her analysis, she determined that A&A had paid EPI a total of $18,962,595 over the course of the venture, based on records of wire transfers. See Ex. 388. She determined that EPI's total gross sales during the course of the venture were $19,724,848.90, after deducting duplicate prescription claims. After deducting $552,000 for the credits and refunds that A&A made, she arrived at an adjusted gross sales figure of $19,172,549.13. She calculated the 10% due to A&A on that amount. She testified that the difference in Barbara Rigby's calculation of total sales of $23,488,689.73 and her calculation can be explained by the fact that the overbilling for duplicates and reships amounted to more than $3 million. *See* Ex. 196. She testified that the data supporting her analysis is on two CD-ROMS that were produced to opposing counsel but have not been admitted in evidence. She also testified that she made several mistakes in her calculation, but that they have been corrected.

Ms. Piti also testified that she used the numbers provided by Mrs. Rigby to calculate Mr. Barta's share of profits and then subtracted the $601,200 he had received as a

12

dividend distribution from that figure.  She totaled the amounts she determined were owed to A&A and/or Barta for overbilling, 10% commission, and share of the profits, less the corrected amount that EPI had invoiced in 2005 and 2006, and concluded that approximately $3.1 was owed to A&A and Barta.  *See* Ex. 372.  She stated that she did not correspondingly deduct the overbilling and commission amounts from EPI's profit figures when calculating Mr. Barta's share of the profit.

Maranna Bentley, a former A&A customer service employee, testified to A&A's procedures for dealing with customers who complained they had not received prescriptions.  She testified that the joint venture with EPI ran smoothly for the first couple of years, but as time went on, interceptions of shipments by the FDA increased. Customers would then report that a medication had not been received, and Ms. Bentley would report it to Malcolm Rigby to handle.  She stated that she did not know that A&A would be billed a second time for a reshipment.  In 2006, in preparation for the meeting to settle-up with EPI, she performed a calculation based on review of A&A's accounting records (not its adjudication records) of the total number of refunds issued by A&A to its customers and came up with a total figure of $1,012,000.  *See* Ex. 118.

At the close of evidence, all of the parties moved for judgment as a matter of law. The court sustained the motion of Malcolm and Barbara Rigby for a judgment of dismissal on the conversion claim against them in their personal capacities, and found that EPI's U.C.C. claim for goods sold and delivered was subsumed in its breach of contract claim and should be dismissed, but reserved ruling on the remainder of the motions.  The court determined that several terms of the oral contract had been established as a matter of law

and so instructed the jury.[3]  *See* Filing No. 253, Final Jury Instructions, Instruction No. 34. The case was submitted to the jury in special interrogatories.  Filing No. 249, Jury Verdict (Special Interrogatories).

The jury was instructed on the elements of breach of contract and misrepresentation as well as the elements of the affirmative defense of fraud in the inducement.  Filing No. 253, Final Jury Instructions at 24, 31, & 33.  However, the court informed the parties that it would treat the jury's answers to the damages interrogatories as advisory only.

In answers to the special interrogatories, the jury found that A&A had not agreed in the oral contract to bear the cost of all reshipments, refunds, duplicates and credits and that the reshipments, refunds, duplicates and credits amounted to $4,381,893.86.[4]  Filing No. 249, Jury Verdict (Special Interrogatories) at 1.  Further, the jury found that A&A and/or Barta had proved that under the terms of the parties' oral agreement, A&A, and not Barta individually, was entitled to a 10% payment on total gross sales and determined that the amount of total gross sales was $1,917,254.91.[5]  *Id.* at 2.  The jury also found that A&A had proved that EPI breached the oral contract and determined that the amount owed to A&A for the breach was $2,469,564.68.  *Id.*  It further found that A&A had proved its claim of fraudulent misrepresentation and determined the amount of its damages were

---

[3]The court determined that (1) EPI agreed to supply prescription drugs to A&A customers at a standard discounted purchase price; (2) A&A or Mr. Barta was to receive, before expenses, 10% of the total gross sales of prescriptions to EPI for soliciting and processing the prescription orders, as well as performing all customer service functions on a day-to-day basis; and (3) All profits earned by EPI were to be split equally among the three shareholders of EPI.

[4]That amount corresponds to Christine Piti's testimony.

[5]The jury's answer to this interrogatory contains an obvious error.  The jury was asked to calculate the amount of EPI's gross sales from which Barta's 10% would be determined.  It arrived at the figure of $1.9 million, which would be the 10% calculation of total gross sales of $19 million.  Accordingly, the court interprets the jury's answer to mean it found that EPI had gross sales of approximately $19 million, resulting in approximately $1.9 million as 10% of that figure.  This amount also corresponds to Ms. Piti's testimony.

$4,381,893.86.[6]  It also found that James Barta had proved that EPI breached its obligation

to him and determined that EPI owes Barta $2,016,113 for the breach of contract.[7]

## II.  DISCUSSION

### A.  Law

Under Rule 50 of the Federal Rules of Civil Procedure, judgment as a matter of law

should be granted if "a party has been fully heard on an issue and there is no legally

sufficient evidentiary basis for a reasonable [fact-finder] to find for that party on that issue."

Fed. R. Civ. P. 50(a)(1); see First Union Nat'l Bank v. Benham, 423 F.3d 855, 863 (8th Cir.

2005).  The court must draw all reasonable inferences in favor of the nonmoving party

without making credibility assessments or weighing the evidence.  Id.  A reasonable

inference is one that can be drawn from the evidence without resort to speculation. See

id. Judgment as a matter of law is appropriate when the record contains no proof beyond

speculation to support a verdict.  Id.  With respect to a post-verdict motion for judgment as

a matter of law, the evidence must be viewed in the light most favorable to the verdict.

Structural Polymer Group, Ltd. v. Zoltek Corp., 543 F.3d 987, 991 (8th Cir. 2008).

Determination of the measure of damages is a question of law.  Tolliver v. Visiting

Nurse Ass'n of Midlands, 771 N.W.2d 908, 914-15 (Neb. 2009).  One injured by a breach

of contract is entitled to recover all one's damages, including the gains prevented as well

as the losses sustained, provided the damages are reasonably certain and such as might

naturally be expected to follow the breach.  Katskee v. Nevada Bob's Golf, 472 N.W.2d

---

[6]That amount corresponds again to Ms. Piti's testimony regarding overbilling and is the same as the amount the jury determined as reshipments, duplicates, etc.

[7]That amount represents Barta's share of the approximately $6 million profit reflected in EPI's profit and loss statements.

372, (Neb. 1991).  They need not be proved with mathematical certainty, but they cannot be established by evidence which is speculative and conjectural.  *Id.*

Whether the evidence of damages is "reasonably certain" is a question of law. *Pribil v. Koinzan*, 665 N.W.2d 567, 572 (Neb. 2003).  If the evidence provides a basis for determining damages with reasonable certainty, i.e., the evidence of damages is not speculative or conjectural, the issue of damages can be submitted to the jury. *Id.* at 573. One seeking recovery in a contract action has the burden of proving damages with as much certainty as case permits. *Lone Cedar Ranches, Inc. v. Jandebeur*, 523 N.W.2d 364, 371 (Neb. 1994).  Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *Id.; Ben Simon's, Inc. v. Lincoln Joint-Venture,* 248 535 N.W.2d 712, 715 (Neb. 1995) (holding that the complete failure to prove any monetary damages provides no reasonably certain factual basis for computation of the loss, and consequently there is uncertainty as to the fact of whether damages were sustained at all; the absence of such a record is fatal to recovery). Establishing that an accounting practice or method is inconsistent with GAAP requires expert testimony. *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1421 (3d Cir. 1997); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 n.9 (3rd Cir.1996) (characterizing GAAP proof as a battle of experts); *Florida State Bd. of Admin. v. Green Tree Fin. Corp,* 270 F.3d 645, 666 (8th Cir. 2001); *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1369 n.6. (Fed. Cir. 2003) (stating that expert testimony can be considered to establish the requirements of GAAP).

16

The distinct tort of fraud or misrepresentation is generally an economic tort against financial interests, asserted to recover pecuniary loss. *Tolliver v. Visiting Nurse Ass'n of Midlands*, 771 N.W.2d 908, 914-15 (Neb. 2009). One who makes a fraudulent or negligent misrepresentation in a business transaction is normally liable only for the recipient's pecuniary losses, that is, "a 'loss of money or of something having monetary value.'" *Id.* at 915 (quoting Black's Law Dictionary at 1031). For misrepresentation claims, "a defendant's liability for pecuniary losses is generally limited to the plaintiff's out-of-pocket losses or sometimes benefit-of-the-bargain losses, depending upon the context and type of misrepresentation." *Id.* Generally, out-of-pocket damages are appropriate for negligent misrepresentation and benefit-of-the-bargain damages are appropriate for intentional misrepresentation or fraud. *Burke v. Harman*, 574 N.W.2d 156, 174-76 (Neb. App. 1998).

Unjust enrichment, part of the law of restitution, is used to create an implied or quasi-contractual relationship in the absence of an express contract between parties and has been defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. *Kisicki v. Mid-America Fin. Inv. Corp.*, 2002 WL 31654490, *6 (Neb. Ct. App. 2002). Unjust enrichment describes a recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay. *Id.* The doctrine of unjust enrichment is recognized only in the absence of an agreement between the parties. *See Washa v. Miller*, 546 N.W.2d 813 (Neb. 1996). "The doctrine does not operate to rescue a party from the consequences of a bad bargain." *Id.* at 819. The enrichment of one party at the expense of the other is not unjust where it is permissible under the terms

of an express contract.  *Id.*  Generally, in order to be entitled to the equitable remedy of accounting, it is necessary to allege a fiduciary, trust, or confidential relationship; a complicated series of accounts; or the inadequacy of a remedy at law, the latter being the basic reason for asserting equitable jurisdiction.  *See Trump, Inc. v. Sapp Bros. Ford Center, Inc.*, 210 Neb. 824, 317 N.W.2d 372 (1982).  On the other hand, an accounting action at law is based upon a contract, express or implied.  *Harmon Care Centers v. Knight*, 215 Neb. 779, 340 N.W.2d 872 (1983).  For an action for a legal accounting to lie, it must appear that the defendant has received property or money not belonging to him or her, for which he or she is bound to account to the plaintiff, and that the plaintiff is the owner of such property or money.  *Id.*

    B.   Analysis

        1.   Legal claims

In its answers to the series of interrogatories, the jury essentially found in favor of A&A and Mr. Barta and against EPI.  The jury made credibility determinations and found that EPI had not proved its claim that A&A had breached the oral contract.  The court finds that the evidence fully supports that finding and a judgment of dismissal will be entered accordingly.   The jury's finding that EPI had not proved that A&A and/or Mr. Barta breached the oral contract is consistent with its determination that A&A and/or James Barta did not agree to absorb losses up to 5%.  The evidence on the issue created an issue of fact.  The jury obviously credited the testimony of Mr. Barta over that of the Rigbys and Mr. Silberg and apparently rejected EPI's argument that it was entitled to payment for invoices regardless of whether the medications were ever delivered, provided that it delivered 95% of the medications.  Further support for the jury's determination is found in the common-

sense conclusion that the "losses" due to reshipments, refunds, duplicates and credits should be borne by the three shareholders as an expense that would lower EPI's net profits, and accordingly would reduce the shareholders' distributions.  In the ultimate analysis, Mr. Barta and the other two principals would ultimately bear any shipping losses since the losses would reduce EPI's net profit.

Also, the jury's finding on EPI's breach of contract claim is reasonably based on a finding that EPI failed to prove that the goods it invoiced were delivered to A&A's customers.  No reliable written data or documents were submitted to the court, audited or otherwise, that supported EPI's claim for goods delivered.  The court thus finds the evidence supports the jury's finding that EPI had not proved that A&A breached the oral contract, and finds that EPI's breach of contract claim should be dismissed.

A&A's and Barta's breach of contract claims against EPI were premised on purported overbilling, unauthorized expenditures, and failure to pay dividends.  The court finds that the jury's factual determination that the parties agreed that A&A, not Mr. Barta, was entitled to 10% of gross sales is supported by the evidence.  Similarly, the factual findings that underlie the jury's determination that A&A and Barta proved that EPI failed to fulfill obligations under the oral contract and the shareholder agreement are supported in most respects.  The jury's determinations of the monetary amounts necessary to the calculation of damages, however, are not supported by the evidence and the court rejects those determinations.

First, the determination that the total amount of reshipments, refunds, duplicates and credits amounted to $4,381,893.86 is unsupportable.  The jury's determination is based on the testimony of Christine Piti that A&A was "overbilled" by over $4 million during

the term of the agreement.  She arrived at this number by subtracting the gross sales shown in A&A's adjudication systems records from EPI's asserted total gross sales figures. Her analysis is flawed in several respects.  Ms. Piti's review of adjudication records revealed only that numerous customers were sent duplicate prescriptions.  It does not establish that A&A was not paid for the duplicate, nor does it show that duplicate prescriptions were not received by the customers.  Ms. Piti's calculation is of limited value because she is a pharmacist and manager, and not an accountant.  There was no testimony that she was competent to perform such an analysis or that the analysis she performed conformed to any standardized accounting practices or widely-accepted business practices.  The evidence shows she initially made several serious mistakes in her calculations and conclusions, undermining the court's confidence in her methodology.

Her analysis provided support for the obvious fact that some of the medication was either not shipped, was shipped twice, was not received by the customer, or was simply miscounted by EPI.  That revelation is not at all surprising since EPI's accounting system and A&A's accounting system do not automatically correlate the essential tracking information necessary to monitor inventory between the two companies.  Also, her methodology is suspect because she performed what was essentially an audit of sales using an automated system that is not designed for such an inquiry.  The adjudication system is designed to prevent pharmacists from over-supplying patient medications and is used to justify claims for health insurance benefits.  The primary business purpose of the adjudication is to prevent pharmacists from supplying unnecessary medication that will not be reimbursed by insurance carriers.  This program presumably was used throughout the business transactions between the parties to fill customer orders for medication.  The

20

duplicate, over-supply and supply failures identified by her analysis arguably would have been or should have been prevented by the adjudication system.  Further, at least one component of her analysis was incorrect in that she deducted certain sums for overbilling in her computation of the gross sales on which to base the 10% commission, but did not deduct those amounts from the share of profits calculation.

A&A and Barta presented no evidence that Ms. Piti's calculations were correct or appropriate.  The value of her testimony is further diminished by the fact that crediting the testimony would mean that A&A did not notice a discrepancy of over $4 million for four years, calling into question the reliability of its own bookkeeping and accounting practices. Furthermore, Ms. Piti's analysis is based on the assumption that A&A's customers were following the law and obtaining medications themselves only.  If EPI was shipping orders regardless of whether they were duplicates, the customers could have supplied the medication to any number of their family and friends.  All of those orders would have been supplied to the customer under the oral contract between the parties and would have been subject to payment by A&A to EPI.

Moreover, Ms. Piti's ultimate conclusion with respect to the amount of so-called "overbilling" is based on a formula that depends entirely on EPI's gross sales figures as a variable.  The court finds EPI's accounting and bookkeeping is not to be accorded any credibility.  There is no evidence to support EPI's calculation of its total sales.  Because she relied on that figure as part of her calculation, Ms. Piti's analysis is of little value.

Overall, the court finds EPI's bookkeeping and accounting evidence is highly suspect.  Its business records consist of QuickenBooks-generated "invoices" and the profit and loss statements created by Mrs. Rigby from those records.  Nothing but Mrs. Rigby's

discredited testimony supports an inference that the records were created contemporaneously. In fact, the evidence suggests that EPI's records, to the extent they exist, are an after-the-fact reconstruction and/or justification of sloppy accounting or questionable business practices. The "invoices" were presumably printed in preparation for trial. There was no evidence that these "invoices" were the ones submitted to the defendant A&A during the course of this business transaction. The profit and loss statements purport to represent information for the years 2002 through 2006. However, it appears all of them were printed in August of 2006, when Mrs. Rigby came to Fremont, Nebraska, to settle up with A&A and Mr. Barta.

Moreover, the court agrees with the jury's apparent discrediting of the testimony of the Rigbys and Mr. Silberg. Mrs. Rigby testified that the QuickenBooks invoices were prepared by manually entering the quantity of drugs ordered and the date the drugs were ordered within approximately seven days of when Mr. Rigby ordered the non-domestically supplied medication. In spite of its awareness that A&A could not reconcile EPI's invoices with A&A's records, no effort was made to enter the patient's prescription number or name into QuickenBooks data. Any data EPI may have had that would provide a means or method of correlating orders or inventory between A&A and EPI, or from EPI to its suppliers, or EPI's suppliers to either the customers or to EPI is either nonexistent, was stolen, or was lost in an electrical storm. EPI did not follow prudent business practices in backing up records and data, further detracting form its credibility.

Ms. Piti's conclusion on the other side of the "overbilling" equation, the calculation of A&A's gross sales, is similarly faulty. Her determination of A&A's total sales is dependent on the sales figures shown in A&A's adjudication systems. The figures found

by Ms. Piti do not correspond to the figures found by Mr. Sheppard, which were based on A&A's accounting system.  Mr. Sheppard is the only witness trained in accounting.  He apparently has a degree in accounting, but is not a CPA.  However, he accepted EPI's business records at face value.  Although Mr. Sheppard's analysis was helpful to the court in that it gave the court an overview of the business arrangement and how the money should have been distributed, albeit giving EPI the benefit of its apparent operational largess, his analysis was based on EPI's figures and is also questionable.

Presumably, the adjudication system shows the payments that A&A received from customers or insurers for medications sent by EPI to the customers.  Theoretically, the adjudication systems should prevent duplicate prescriptions as well as duplicate billings and/or payments.  The evidence does not show whether A&A was paid once or twice for the prescriptions that turned out to be duplicates, whether that customers received two prescriptions for the price of one, or whether customers or providers paid for medications they did not receive, or failed to pay for medications they in fact received.  The only calculations in Ms. Piti's analysis that the court finds to be reliable and supported by evidence are the amount of money that A&A actually paid to EPI, as shown by the wire transfers showing payments amounting to $18,962,595, and the $552,299 in refunds and credits that A&A actually paid out, as reflected in its accounting records.  In other words, there has been no showing that the purported "overbilling" resulted in any out-of-pocket loss to A&A other than the $552,299 it actually refunded or credited to customers and there is nothing to support the conclusion that it was damaged to the extent of $4.5 million.  The rest of Ms. Piti's analysis relies on accepting EPI's figures at face value, and those figures are simply not reliable.  The jury's determination of the amount of EPI's gross sales was

dependent in part on the amount of the reshipments or duplicates and is similarly unreliable.

The court finds that A&A's and Barta's failure to prove the essential element of damages in connection with their claims is fatal to their recovery. The evidence clearly shows that A&A's customers received some, if not most, of the medications A&A was billed for but did not pay for in 2005-2006. Mr. Barta's efforts to "settle up" and his offer of the not-inconsequential sum of almost $450,000 to EPI are an admission of that fact. However, just as EPI has not proved the number of medications it delivered, A&A has not proved the converse. There is an absence of evidence from which the court can reliably quantify the amount of money A&A actually owes to EPI, or vice-versa. Since A&A retained the benefit of the money it withheld from EPI, it is unclear that it suffered any damage at all, so the failure to prove its damages is fatal to its claims.

Based on this record, any determination of sales, expenses, and profits would be speculative and conjectural. The court has not been presented with competent evidence or expert testimony on sales, expenses, profits, advances, costs, or payments. Although there is evidence that EPI breached the oral agreement and the shareholder agreement and made numerous misrepresentations of material facts, the court cannot craft a remedy for the violations because there is a failure of proof on damages.

The damages component of A&A's and Barta's claims is premised exclusively on the testimony of Christine Piti and Alan Sheppard. Both Piti and Sheppard are fact witnesses, although they provided testimony more in the in the nature of evidence that one would expect from an accounting expert or economist. Neither Sheppard nor Piti were disclosed as or treated as expert witnesses. Generally expert testimony is required to

establish the damages in a case as complicated as this one. Complicated accounting principles, standard business practices and bookkeeping methods or standards are beyond the general knowledge and experience of most courts and jurors. An analysis of the accounting issues and irregularities in this case requires proof of standard accounting practices (such as GAAP requirements) and no such evidence was provided by either side in this dispute. Neither party produced any reliable evidence from which the court or a jury could calculate damages.[8]

There is a dearth of evidence on several crucial components that are necessary to determine the value of the respective business interests in this case. Although it is clear there were sales that resulted in profits, any computation of a total profit figure would be within the realm of speculation. No corporate or individual tax returns or records were introduced. There are no corporate by-laws or corporate minutes to justify operations or expenses. The parties did not present the court with any accounting audits, certified or otherwise. There was no testimony by a forensic accountant or economist who reviewed any of the records of either corporate party. No expert testified to the propriety or correctness of the parties' respective methodologies or theories. There is no evidence that any financial statements were provided to or reviewed by Mr. Barta during the course of the business transaction.

Profit is generally determined by subtracting expenses from total sales. Here, there is no reliable evidence of the actual sales and expenses cannot be determined because there was no evidence of the most important expense, the amount that EPI paid for the goods it sold, in turn, to its only customer, A&A. It is unclear from the evidence whether

---

[8]For that reason, the court was hesitant to submit the damages issue to the jury, but agreed to do so using the jury's calculations as advisory. As noted, the jury was not instructed on the measure of damages, so the court cannot afford its findings any weight.

the cost-of-goods figures shown on Mrs. Rigby's profit and loss statements included commissions, dispensing fees or other fees or to whom the payments were made.

Although it is clear that the joint venture produced a profit and each of the shareholders were compensated in some way, it is not possible to fashion a remedy that would fairly compensate A&A and/or Barta for whatever losses the breaches of contract or misrepresentations caused, in view of the fact that A&A/Barta admittedly withheld payments for some undetermined amount of goods it received. The purported showing of entitlement to additional remuneration is based on accounting records that are thoroughly discredited. Accordingly, the court finds the parties' legal claims and counterclaims result in a so-called "dogfall" as the result of both parties' failure to prove the damages that are an essential element of their respective claims.

## 2. Equity

The court finds equity provides no further remedy to the parties. Neither party is entitled to prevail on equitable issues. The evidence shows that this case originates in a series of meetings between EPI's principals, James Barta, Malcolm Rigby, and Hilton Silberg. In the end, these three principals entered into an oral agreement in which the newly-formed entity would provide A&A's customers medication for a price that was 25% lower than the 85% of AWP, plus a nominal payment per prescription, that A&A normally charged its customers. The evidence suggests that is the price A&A charged its customers. Mr. Silberg is a licensed pharmacist in Canada and he was to provide the Canadian medications at that price. Mr. Rigby agreed to provide the data-system technical expertise to download the orders from A&A and to communicate the information to the pharmaceutical dispensary, which, in turn, would obtain and then ship the medications to

A&A's customers.  Mr. Barta conceded at trial that the Rigbys and Silberg deserved some remuneration for their efforts but there is no evidence as to what that sum would be.

The evidence adduced at trial shows that, due to the peculiarities of pharmaceutical pricing and the vagaries of the international market for pharmaceuticals, EPI was able to procure the medications for substantially less than the price A&A would charge for them, thus generating substantial profits.  The testimony at trial establishes that EPI's profit figures were artificially low because the company's expenses, which, under EPI's system of accounting, included the Rigbys' unauthorized consulting fees, Silberg's unauthorized markups, payments to entities the Rigbys and Silberg owned, and cash and medications stolen under dubious circumstances, were highly inflated.  The high consulting fees, commissions, shipping expenses and corporate travel expenses used up a large percentage of the gross profit generated by the difference between the cost of goods sold and the price to A&A.  Some of these expenses may have been legitimate, but some were not.  The only evidence of the actual costs of goods sold to EPI are the discredited profit and loss statements prepared by Mrs. Rigby.  The record contains no underlying documentation to substantiate those costs.  Based on evidence of the collusion between the Canadian principals that can be inferred by the their creation of the Barhill entity, as well as evidence that suggests some sort of inappropriate arrangement with Mr. Greenfield, the pharmacist who later ran off with the money, records, and medications, it would be reasonable to assume that the costs of goods sold were even lower than they appear on the profit and loss statements.  Such an assumption must remain only that, because there is no reliable, trustworthy economic or accounting evidence of the purported losses or gains.

The court finds that the company's net profits could be as high as $9½ million over the course of the agreement were it not for the inflated expenses.  It is clear that the Rigbys and Silberg walked away with a significant percentage of the company's earnings.  The Rigbys testified that they received over $900,000 in consulting fees over the course of the agreement and the profit and loss statements show close to $1.6 million was expended on consulting fees.  Further, the Rigbys admit that dividends of almost $700,000 were paid to the trust for their family's benefit.

The evidence as to the amount of money taken out of the corporation by Mr. Silberg is somewhat more indeterminate.  By his own admission, the trust for his family's benefit received close to $1.2 million in dividends.  He testified that the dividend payments included his 10% commission.  However, he also testified that he marked up the medications by 10%, which could indicate double compensation.  Further, the record is unclear on whether Silberg received the commission or markup on the medications he dispensed from Canada, or on all the medications procured from other countries as well.  He clearly received some payments through Tonley and Barhill.  At one point, Mr. Silberg borrowed between $300,000 and $500,000 (he couldn't remember the amount) that he admits was never repaid.  Mrs. Rigby testified that the sum was $300,000 based only on a QuickenBooks entry that she never produced.

Mr. Barta was advanced dividends of $601,200 in addition to any profits his company, A&A, earned.  The evidence suggests that A&A was realizing profits during this undertaking, otherwise it would have noticed a $4½ million shortfall.  Unfortunately, the court cannot determine with any specificity what A&A was paid and accordingly cannot determine an amount that would bring the parties' respective shares of the profits into

balance.  The evidence also suggests that EPI is currently only a shell with no liquid assets.

The evidence fully supports the jury's findings of misfeasance or malfeasance on the part of the Rigbys and Silberg that justifies the dismissal of EPI's legal claims.  With respect to its equitable claim for unjust enrichment, EPI has not shown that either Barta or A&A were unjustly enriched by the venture because it has not shown the amount A&A benefitted from the payments it withheld.  The evidence suggests that the Rigbys and Silberg most likely benefitted to at least the same degree as Barta over the course of the venture.

By the same token, although A&A and Barta have shown the sort of conduct that sometimes justifies an equitable remedy, the court finds that A&A and Barta have not presented the court with any reasons to award any relief in equity beyond the amount they retain by virtue of the judgment in A&A's favor on EPI's claims.  Mr. Barta does not come to the court with entirely clean hands; to some degree he is in a situation of his own making.  Barta, the Rigbys and Silberg all wore several hats in connection with the venture and their interests did not necessarily coincide.  There were indications early on that EPI's accountings were incorrect, improper, or incomplete.  Barta ignored the warning signs and acquiesced in the improprieties and sloppy or creative accounting as long as the venture remained highly profitable.  Further, the evidence shows that Barta exercised control over the venture by withholding payment and essentially paying whatever he wanted to pay whenever he wanted to pay it, instead of insisting on a proper reconciliation of inventories and orders.  The evidence suggests that the venture was so highly profitable for a time that Mr. Barta simply did not care about the details.

29

The evidence also shows that the business entity was created in part as a tax avoidance vehicle. All of the partners presumably benefitted from the tax consequences. The tax aspect of the arrangement may explain the reticence, on both sides, to utilize forensic accountants or other experts to clarify the records and aid the jury and the court in understanding the convoluted bookkeeping and accounting issues presented in the case.

This business venture produced multi-million-dollar sales and profits during its term, and all three shareholders came away with something. Although the court cannot balance the parties' respective shares with any precision, the evidence seems to indicate that a relatively fair result has been achieved in this action. This was a transaction executed between sophisticated businesspeople and the parties received the benefit of their bargain. In the end, the court believes the jury's findings, at least as to liability, are fair. EPI gets nothing and the defendants get no more than they held back during the business association. The principals all took from one another. It cannot be determined how much each took from whom or why. They each came away from the transaction with more money than they had when they started, which is more than many businesses can claim.

With respect to an accounting remedy, A&A and Barta have not alleged a confidential relationship or shown an inadequate remedy at law. The accounting sought in the action is more in the nature of an accounting at law based on a contract. The result in this case reflects the finding that A&A and Barta have not shown that EPI has property of A&A and/or Barta for which it must further account. Accordingly,

IT IS ORDERED:

1.  The parties' motions for directed verdict are granted in part and denied in part in accordance with this Memorandum and Order.

2.  The court accepts the jury's findings as set forth in this Memorandum and Order.

3.   A judgment in conformity with this Memorandum and Order will issue this date.

DATED this 11th day of May, 2011.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.